IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**LINDA KAY REED,**

 **Plaintiff,**

**v.**             **Civil Action No. 2:18-cv-01156**

**ANDREW SAUL[1],**
**COMMISSIONER OF SOCIAL SECURITY,**

 **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before this Court is Plaintiff's Memorandum in Support of Judgment on the Pleadings (ECF No. 9), Defendant's Brief in Support of Defendant's Decision (ECF No. 12) and Plaintiff's Reply to Brief in Support of Defendant's Decision (ECF No. 13). This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's application for disability insurance benefits (DIB) under Title II of the Social Security Act.

### Background

Claimant, Linda Kay Reed, filed an application for DIB on December 11, 2014. Claimant alleged disability beginning November 7, 2014. The claim was denied initially on March 10, 2015, and upon reconsideration on May 8, 2015. Claimant filed a request for hearing on June 24, 2015. On May 4, 2017, an Administrative Law Judge (ALJ) presided over a hearing in Charleston, West Virginia. The ALJ denied Claimant's application on May 12, 2017. Claimant requested the

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). *See also* Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (stating action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Appeals Council review the ALJ's decision. The Appeals Council denied Claimant's request for review on May 20, 2018 (Tr. at 1-6). Subsequently, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Standard of Review

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520 and 416.920 (2018). If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a) and 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b) and 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. *Id.* §§ 404.1520(c) and 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d) and 416.920(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(e) and 416.920(e). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-869 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and

claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f) and 416.920(f) (2018). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.*
>
>> (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the

3

>amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
>(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation:
>>Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
>(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the

claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section. 20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since November 7, 2014. Claimant meets the insured status requirements through December 31, 2019 (Tr. at 13). Under the second inquiry, the ALJ found that Claimant suffers from the medically determinable impairments: generalized anxiety disorder with social phobia; sensory integration disorder; dysthymic disorder; and headaches. (*Id.*) However, under the third inquiry the ALJ found that Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. at 14). At the fourth inquiry, the ALJ found that Claimant has the residual functional capacity (RFC) to perform a full range of work at all exertional levels, with the following additional non-exertional limitations: she is limited to simple, routine and repetitive tasks, but not at a production rate pace. She can never interact with the public, but she can occasionally interact with supervisors and co-workers in

numbers less than three (Tr. at 17). The ALJ found that Claimant can perform jobs in the national economy such as laundry worker, price marker and garment folder (Tr. at 20). Accordingly, the ALJ denied Claimant's application for DIB (Tr. at 21).

## Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In *Blalock v. Richardson*, substantial evidence was defined as:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Cellebreze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

## Claimant's Background

Claimant was born on August 30, 1955 (Tr. at 69). She graduated from high school. Claimant lives with her husband. Claimant's 18 year old grandchild visits her at her house (Tr. at 81). Claimant drives approximately once a week when she goes to the store (Tr. at 86).

The Medical Record

The medical record has been adopted, as set out in the Plaintiff's Memorandum in Support of Judgment on the Pleadings, Defendant's Brief, Plaintiff's Reply and the ALJ's decision to the extent as follows.

Bairava S. Kuppuswamy, M.D.

On November 24, 2014, Claimant complained of depression, insomnia and hypothyroidism to Bairava S. Kuppuswamy, M.D., her primary care physician at Camden Clark Primary Care (Tr. at 334). Claimant reported going through a lot of stress with the loss of her job and coping with her family during the holidays (Tr. at 336). Dr. Kuppuswamy prescribed Xanax for Claimant's complaints and continued to prescribe Temazepam because it was controlling Claimant's insomnia (Tr. at 336).

Claimant returned to Dr. Kuppuswamy on February 25, 2015, and reported sleeping five to six hours per night. She stated that her depression was severe and worsening (Tr. at 341). Dr. Kuppuswamy observed that despite increasing Claimant's medication during her previous visit, her pharmacy had never received the prescription to increase the dosage of Fluoxetine. (*Id.*) Claimant complained of having anxiety, headaches, and a decreased memory (Tr. at 342). Dr. Kuppuswamy described Claimant's mood and affect as normal and did not observe any impairment of concentration (Tr. at 344). Dr. Kuppuswamy increased Claimant's medication dosage in Fluoxetine (Tr. at 345).

On June 1, 2015, Claimant stated that her depression was moderate in severity (Tr. at 375). Dr. Kuppuswamy described Claimant's mood and affect as normal and she displayed no impairment of concentration (Tr. at 378). On October 5, 2015, Claimant reported feeling well with a good energy level and that she was sleeping well (Tr. at 382). On examination, Dr. Kuppuswamy

7

described Claimant's mood as normal (Tr. at 385). On February 12, 2016, Claimant described her depression as moderate in severity (Tr. at 396). However, Dr. Kuppuswamy noted that Claimant's depression was stable and that she was doing well (Tr. at 399).

On June 20, 2016, Dr. Kuppuswamy found that Claimant's insomnia was controlled and that her depression was stable and doing well (Tr. at 413). On October 4, 2016, Claimant stated that her depression was improving, but that she was still having social anxiety when in public places (Tr. at 33). Dr. Kuppuswamy described Claimant's mood and affect as normal and noted that her insomnia was controlled (Tr. at 35-36).

Kara Gettman-Hughes, M.A.

On January 29, 2015, State agency psychologist, Kara Gettman-Hughes, M.A., performed a neuropsychological examination of Claimant (Tr. at 320-329). On mental status examination, Claimant had an anxious mood and affect (Tr. at 324). She had a normal thought process, mildly impaired judgment, and fair insight. (*Id.*) She denied suicidal ideation and had intact immediate memory, moderate to severely impaired recent memory, and fair remote memory. Claimant had mildly impaired concentration and persistence and slightly slow pace. She also displayed mildly impaired social functioning (Tr. at 325). Ms. Gettman-Hughes diagnosed panic disorder with agoraphobia, generalized anxiety disorder and an unspecified neurological disorder. (*Id.*)

Brandon Smith, M.D.

Brandon Smith, M.D., Tri-State Occupational Medicine, Inc., performed a consultative physical examination of Claimant on February 9, 2015 (Tr. at 329-334). Claimant stated that she was disabled due to headaches (Tr. at 329). Claimant's surgical history list included "eye surgery for lazy eye" (Tr. at 330). Dr. Smith diagnosed Claimant with headaches that tended to come on during panic attacks (Tr. at 332).

Westbrook Health Services

On March 19, 2015, Claimant was seen at Westbrook Health Services by Taniya Pradhan, M.D., due to complaints of having ten panic attacks causing her "mind to freeze," some double vision, and numbness in her legs (Tr. at 363). Claimant stated that these attacks lasted anywhere from ten seconds to two minutes. (*Id.*) On examination, Claimant was cooperative, polite, and extremely engaging (Tr. at 364). She described her mood as tense but her affect was normal. (*Id.*) Claimant had intact concentration, but a mildly impaired memory. Dr. Pradhan diagnosed generalized anxiety disorder and dysthymic disorder (Tr. at 365). Dr. Pranhan prescribed Celexa and Restoril.

On April 30, 2015, Claimant returned to Westbrook Health Services for symptoms of anxiety (Tr. at 359). She reported doing well on Celexa, but still complained of a disinterest in socializing. She also reported spontaneously stopping Xanax (Tr. at 359). On examination, Dr. Pradhan reported that Claimant was very well groomed, wore a new wig, and her make up coordinated with her clothing (Tr. at 360). She had a normal affect and denied anxious preoccupations. (*Id.*) She had fair insight and judgment, intact memory, and described her mood as "fine." However, she reported her medication had side effects such as random stomach aches and dry mouth. Dr. Pradhan diagnosed generalized anxiety disorder with social phobia-type symptoms and dysthymic disorder. Dr. Pradhan increased Claimant's dose of Celexa and also prescribed Restoril for sleep.

On July 9, 2015, Claimant saw Dr. Pradhan and reported having a "rough" couple of days after having to take her mother-in-law to several appointments (Tr. at 368). She reported having headaches and feeling anxious when she left her house. (*Id.*) On examination, Claimant was pleasant and cooperative, had a normal affect, and intact concentration and memory (Tr. at 369).

Dr. Pradhan instructed Claimant to continue taking Celexa and Ambien. (*Id.*)

On October 29, 2015, Claimant reported to Dr. Pradhan that she was doing very well with her current medications and was not feeling as anxious as before. She denied any anxiety attacks and stated that her anxiety leaving the house had not been as bad as before (Tr. at 371). Claimant described her mood as really good and denied headaches. On examination, Claimant displayed a good mood, normal affect, normal thought process and intact concentration (Tr. at 372).

On April 26, 2016, Claimant was examined at Westbrook Health Services by Cheryl France, M.D., at which time Claimant reported doing pretty well but still had some physical sensations when she left the house (Tr. at 406). She reported disliking noisy places and sometimes using ear plugs. On mental status examination, Claimant had an anxious mood but otherwise exhibited no abnormalities. Dr. France noted that Claimant had a good prognosis (Tr. at 407). On June 28, 2015, Claimant returned to see Dr. France and noted that her anxiety improved but she still felt anxious when she was around a lot of people and noise

On September 27, 2016, Claimant reported to Dr. France that she was having stress because her mother-in-law was in the hospital and complained of having sensory overload when in noisy environments with lots of lights (Tr. at 420). On examination, Claimant had an anxious mood but her mental status examination was otherwise normal. (*Id.*) On November 15, 2016, Claimant was seen by Dr. France (Tr. at 424-430). Claimant appeared anxious, but had no other psychiatric abnormalities (Tr. at 424). Dr. France increased Claimant's medications and noted that she had a good prognosis (Tr. at 425).

Eye Care Associates of Belpre

On October 17, 2013, Christopher Stanwick, O.D., an ophthalmologist, performed an eye health and vision examination on Claimant (Tr. at 314-316). At this time, he diagnosed

staphylococcus blepharitis, amblyopia strabismic, hyperopia, an astigmatism and presbyopia (Tr. at 315). Dr. Stanwick prescribed a medication for Claimant's eyelid inflammation and prescribed updated glasses. (*Id.*)

On January 12, 2015, Dr. Stanwick completed a questionnaire and noted that Claimant had some reduced visual acuity, but no visual field abnormalities, of the right eye due to amblyopia strabismic (Tr. 319).

On September 22, 2016, at Eye Care Associates of Belpre, Ohio, Claimant underwent an eye health and vision examination due to complaints of blurred vision with fine print, redness in and around her eyes, double vision, photophobia and headaches (Tr. at 416). Claimant's mood was pleasant and sociable. (*Id.*) Following the examination, Dr. Stanwick diagnosed hypermetropia, an astigmatism and presbyopia (Tr. at 418). Dr. Stanwick prescribed updated glasses. (*Id.*)

### State Agency Consultants Jim Capage, Ph.D. and Karl G. Hursey, Ph.D.

On February 20, 2015, Jim Capage, Ph.D., reviewed the evidence of record and concluded that Claimant's anxiety would not prevent her from performing simple, routine, work-related activities that were low stress with no strict production quotas, no complex decision making, and no supervisory responsibilities (Tr. at 104). He noted that because Claimant was socially avoidant, she would do best working in a setting with no more than occasional superficial social interaction. (*Id.*) On May 6, 2015, Karl G. Hursey, Ph.D., State agency psychologist, affirmed Dr. Capage's mental functioning assessment (Tr. at 118).

### State Agency Consultants Atiya M. Lateef, M.D. and Rogelio Lim, M.D.

On March 2, 2015, Atiya M. Lateef, M.D., a state agency physician, reviewed the evidence of record and found Claimant's physical impairments, including her visual impairments, were not

11

severe (Tr. at 100). On May 1, 2015, Rogelio Lim, M.D., a state agency physician, reviewed the evidence of record and affirmed Dr. Lateef's assessment (Tr. at 116).

### Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the ALJ failed to consider the severity of her strabismic amblyopia at step two of the sequential evaluation process (ECF No. 9). Claimant argues that the ALJ failed to account for her marked difficulties in interacting with others in her residual functional capacity assessment (RFC). (*Id.*) Additionally, Claimant asserts that the ALJ's RFC assessment of Claimant is not based on substantial evidence.

In response, Defendant asserts that Claimant's diagnosis of a strabismic amblyopia did not result in functional limitations that would interfere with her ability to work (ECF No. 12). Defendant asserts that the ALJ reasonably accounted for Claimant's social limitations when assessing her RFC. (*Id.*)

### Discussion

The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace. 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 04.1505(a); *see Heckler v. Campbell*, 461 U.S. 458, 459-60 (1983); *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[An impairment] is not necessarily disabling. There must be a showing of related functional loss."). The responsibility for determining whether Claimant is disabled resides with the Commissioner. 20 C.F.R. § 404.1527(e)(1). To be eligible for disability benefits, Claimant bears the burden of showing not only that she has a medically determinable impairment, but that it is so severe that it prevents her from engaging in her past relevant work or any other substantial gainful activity that exists in the national economy for a 12-month period. 42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A).

At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii). The regulations define a "severe impairment" as an impairment which significantly limits a claimant's physical or mental ability to perform basic work activities. *See* 20 C.F.R. § 404.1521(a). The impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, 20 C.F.R. § 404.1509. Additionally, the impairment must not be controlled by treatment, such as medication. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). An impairment is "not severe" at step two only when the medical evidence establishes no more than a slight abnormality that would have no more than a minimal effect on an individual's ability to work. SSR 85-28, 1985 SSR LEXIS 19 at *2.

As a result of her panic attacks, Claimant asserts that she is "partially blind in right eye" and has "double vision" (Tr. at 215). She described headaches, double vision, memory loss, loss of concentration and difficulties in understanding instructions due to panic attacks (Tr. at 226, 242). At the hearing, Claimant testified that although she had been prescribed reading glasses, they did not help her double vision or blurred vision in her left eye (Tr. at 89). Claimant stated that although her blurred vision seemed to improve when she was not stressed, she experienced double vision about 90 percent of the time. (*Id.*)

The ALJ found that Claimant had double vision during panic attacks but that "The objective evidence does not establish double vision as a separate medically determinable impairment" (Tr. at 14). To support this finding, the ALJ referenced a Social Security Disability Determination form dated January 12, 2015, that was completed by Claimant's treating physician Dr. Stanwick. The ALJ pointed out that Dr. Stanwick marked the form to indicate that Claimant does not have any visual field abnormalities (Tr. at 319). The ALJ stated that Dr. Stanwick

"reported the claimant had best corrected visual acuities of 20/60 in the right eye and 20/20 in the left eye" (Tr. at 14).

Although Claimant states that she is "basically blind" in her right eye, Dr. Stanwick's statement, from the January 12, 2015 exam, that Claimant had visual acuity of 20/60 in her right eye which does not meet the requirement of reduced visual acuity of 20/200 or less. Further, on September 22, 2016, Dr. Stanwick performed another examination and reported that Claimant's visual acuity of her right eye was 20/125 unaided and 20/80 corrected. Still, this statement does not meet the requirement of reduced visual acuity of 20/200 or less. Dr. Stanwick did not diagnose Claimant with strabismic amblyopia in the September 22, 2016 examination. Dr. Stanwick's treatment plan was for Claimant to wear reading glasses (Tr. at 418).

There is no medical evidence stating that Claimant's visual limitation would interfere in her ability to perform basic work activities. The ALJ considered the severity of Claimant's strabismic amblyopia at step two of the sequential evaluation. Therefore, the ALJ's determination that Claimant's RFC did not require a functional limitation in her ability to perform work-related activities due to her reduced visual acuity is supported by substantial evidence.

Additionally, Claimant argues that the ALJ failed to account for her marked difficulties in interacting with others when determining Claimant's RFC. However, the ALJ accounted for Claimant's marked limitations of social functioning when the ALJ limited Claimant's interaction with other people. The ALJ found Claimant to have severe mental impairments of generalized anxiety disorder with social phobia, sensory integration disorder, and dysthymic disorder resulted in moderate restrictions in understanding, remembering, or applying information; marked limitations in interacting with others; moderate limitations in concentrating, persisting, or

maintaining pace; and no limitations in adapting or managing oneself (Tr. at 15-16). These limitations are consistent with the evidence of record.

Claimant asserts that the present case is similar to *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). In *Mascio*, the Fourth Circuit ruled that since the ALJ had found moderate mental limitations related to concentration, persistence, or pace, the ALJ was required to either present a hypothetical to the vocational expert that included those limitations or to explain in the RFC assessment why it was unnecessary to include such limitations. *Id.*, at 637-638 (4th Cir. 2015). Claimant asserts that "Under *Mascio*, the ALJ's failure either to include corresponding limitations related to marked difficulties in interacting with others or to explain why these limitations were not necessary requires remand" (ECF No. 9).

The cases are not exactly alike because the ALJ in the present case found "marked" limitations in "interacting with others," whereas, the court in *Mascio* addressed "moderate" mental limitations related to "concentration, persistence or pace." Regardless, Claimant's position is that ALJ's RFC assessment did not include sufficient restrictions to accommodate the marked difficulties. The ALJ limited Claimant's RFC by finding that Claimant should never have to deal with the public and could only have occasional interaction with no more three supervisors or co-workers (Tr. at 18). This restriction is consistent with the evidence of record.

The psychiatric treatment notes from Westbrook Health Services show that despite her anxiety, Claimant was cooperative, pleasant, polite, extremely engaging and displayed a good mood (Tr. at 364, 369). Claimant also reported that she was satisfied with medications and that they reduced her anxiety, including her anxiety when leaving her home (Tr. at 51, 56, 371). On April 26, 2016, Claimant's outpatient progress note from Westbrook Health Services reported that despite her complaints of having some physical sensations when leaving the house and disliking

15

noisy places, Claimant had a good prognosis (Tr. at 406-407). On June 28, 2016, treatment notes from Westbrook Health Services reflect that while Claimant still felt anxious when she was around a lot of people, her anxiety was still improved (Tr. at 403-405). Consistent with the treatment notes from Westbrook Health Services, the ALJ reasonably accounted for Claimant's social anxiety triggered by being around a lot of people by limiting her to no interaction with the public and interaction with no more than three people on no more than occasional basis.

The treatment notes from Claimant's primary care physician, Dr. Kuppuswamy, also support the ALJ's social limitations regarding Claimant. Dr. Kuppuswamy noted that despite her complaints of anxiety, Claimant often had a normal mood and affect (Tr. at 35-36, 344, 354. 378, 385). He also noted that Claimant's complaints of depression were stable and that she was responding well to her medications (Tr. at 348, 350, 399, 413). In addition, on January 29, 2015, Ms. Gettman-Hughes examined Claimant and found she only displayed mildly impaired social functioning (Tr. at 325).

The ALJ's assessment of Claimant's social functioning is also supported by the psychological assessments of Drs. Capage and Hursey, the reviewing state agency psychologists. See 20 C.F.R. § 404.1527(e)(2)(i) (noting that state agency medical consultants "are highly qualified physicians [and] psychologists [ ] who are also experts in Social Security disability evaluation."). Specifically, both psychologists reviewed the evidence of record and found that Claimant's anxiety and socially avoidant behavior would not prevent her from performing in a work setting with no more than occasional superficial social interactions (Tr. at 104, 118). The ALJ gave great weight to the opinions of Drs. Capage and Hursey "because they are consistent with the treatment notes that reflect increased anxiety with social interaction and some impairment in concentration and memory" (Tr. at 19).

Accordingly, the ALJ limiting Claimant to no interaction with the public and only occasional interaction with no more than three supervisors and/or co-workers is consistent with the opinion of both state agency psychologists. As such, substantial evidence supports the ALJ's accommodation of Claimant's marked social limitation.

Conclusion

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge AFFIRM the final decision of the Commissioner, DENY Plaintiff's Memorandum in Support of Judgment on the Pleadings (ECF No. 9) and DISMISS this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED and a copy will be submitted to the Honorable Judge John T. Copenhaver, Jr., Senior United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B) and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Copenhaver and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Date: July 3, 2019

_____
Dwane L. Tinsley
United States Magistrate Judge